1              IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF SOUTH CAROLINA
2                     CHARLESTON DIVISION

3
UNITED STATES OF AMERICA        :
4                               :
          vs.                   :
5                               :
BLAIR WITKOWSKI                 :      9:10 – CR – 817
6

7

8

              Plea in the above-captioned matter held on
9
   Monday, September 27, 2010, commencing at 3:40 p.m.,
10
   before the Hon. Sol Blatt, Jr., in the United States
11
   Courthouse, Courtroom III, 81 Meeting St., Charleston,
12
   South Carolina, 29401.
13

14

15

APPEARANCES:
16
                    RHETT DeHART, ESQUIRE, Office of the
17                  U.S. Attorney, P.O. Box 978, Charleston, SC,
                    appeared for the Government.
18
                    EDWARD BART DANIEL, ESQUIRE, P.O. Box 856,
19                  Charleston, SC, appeared for Defendant.

20

21

22

23          REPORTED BY DEBRA L. POTOCKI, RMR, RDR, CRR
         Official Court Reporter for the U.S. District Court
24                        P.O. Box 835
                    Charleston, SC  29402
25                      843/723-2208

1          MR. DeHART:  May it please the Court, Your Honor, the

2     Government would call the case of United States of America

3     versus Blair Witkowski, Criminal No. 9:10-817.  Your Honor, we

4     call this case for purposes of a plea to an information.  The

5     defendant is present and is represented by Bart Daniel.

6         Your Honor, there's a written plea agreement and a waiver

7     of indictment form.

8         (Brief interruption in proceedings.)

9          THE COURT:  I notice this plea agreement is not

10    dated.  I put in the 27th of -- dated at the end, but not in

11    the beginning.  Is it all right with the Government and with

12    the defendant if I fill in September 27th?

13         MR. DeHART:  Yes, sir, I'm sorry, we should have

14    written that on top.  That would be great, Judge.

15         THE COURT:  Is that all right with the defendant?

16         MR. DANIEL:  Yes, Your Honor.

17         THE COURT:  All right, Mr. Daniel, you and the

18    defendant come around, please.

19         MR. DANIEL:  Yes, Your Honor.

20         THE CLERK:  State your name for the record.

21         THE DEFENDANT:  Blair Witkowski.

22         THE COURT:  Mr. Witkowski, how old are you, sir?

23         THE DEFENDANT:  Thirty-five.

24         THE COURT:  What kind of educational background do

25    you have?

1          THE DEFENDANT:  Partial college.

2          THE COURT:  Are you under the care of any doctor for

3    any mental or emotional problems at this time?

4          THE DEFENDANT:  No, Your Honor.

5          THE COURT:  Are you taking any kind of medication

6    that might interfere with your thinking processes?

7          THE DEFENDANT:  No, sir.

8          THE COURT:  You fully understand what's going on here

9    today?

10          THE DEFENDANT:  I do, Your Honor.

11          THE COURT:  Now, Mr. Daniel, I assume, has been

12    retained to represent you?  Is that correct?

13          THE DEFENDANT:  Yes, sir.

14          THE COURT:  Are you fully satisfied with his services

15    to date?

16          THE DEFENDANT:  Yes, sir.

17          THE COURT:  Has he explained this information to

18    which you propose to plead, been over it with you in detail?

19          THE DEFENDANT:  Yes, he has, Your Honor.

20          THE COURT:  Do you fully understand what's in it?

21          THE DEFENDANT:  I do.

22          THE COURT:  Now, under our law, nobody can ever be

23    brought into this Court until the grand jury -- under normal

24    circumstances, until a grand jury has passed upon the facts of

25    the case and found that there was probable cause to believe

1    they may have violated the law.  You can't come in here, the

2    Government can't bring you in here without having your case

3    presented to a grand jury, unless you waive that case being

4    presented to a grand jury, and agree to be proceeded against

5    by what we call an information, which is prepared by the

6    United States Attorney rather than the grand jury.

7        Has Mr. Daniel explained that to you?

8            THE DEFENDANT:  Yes, Your Honor.

9            THE COURT:  And I see that you've signed an agreement

10   to be proceeded against by way of information rather than have

11   your case presented to a grand jury, is that correct?

12           THE DEFENDANT:  Yes, Your Honor.

13           THE COURT:  Now, you are charged in this indictment

14   that from about 2005 through 2008, you were a mortgage loan

15   officer at the Carolina First Bank in Hilton Head, and that

16   you conspired with others to submit fraudulent financial

17   statements regarding loan applications and mortgages, and all

18   the data that goes along with borrowing money on mortgages, in

19   order to defraud the bank and other institutions.

20       Do you want me to -- You say Mr. Daniel has been over this

21   information with you in detail.  Do you want me to go over it

22   any further, or do you fully understand what's in it?

23           THE DEFENDANT:  I fully understand.

24           THE COURT:  Before I can accept your plea of guilty

25   there are a number of questions I'm going to have to ask you

1   to be sure that you are, in fact, guilty, and that your plea

2   is knowingly and voluntarily made.  Do you understand that if

3   you didn't plead guilty, you'd be entitled to a trial by jury

4   in this courtroom in the very near future?

5           THE DEFENDANT:  Yes, Your Honor.

6           THE COURT:  And at such a trial you'd come into court

7   presumed to be innocent, and the Government would have to

8   prove you guilty beyond a reasonable doubt.

9       And at such a trial, in order to do that, the Government

10  would have to put up witnesses to testify against you.  And

11  you, through your attorney, could ask those witnesses any

12  questions that were relevant and appropriate.

13      At the same time, you could present witnesses, if you

14  cared to do so, and you could testify, if you cared to do so,

15  in your behalf.  On the other hand, if you didn't feel it was

16  in your best interests to testify or present evidence or

17  witnesses, you wouldn't have to.  And I'd tell the jury that

18  they couldn't get any inference of your guilt because you

19  didn't testify or put up witnesses, because you don't have

20  anything to prove.  It's the Government's got to prove you

21  guilty beyond a reasonable doubt.

22      Do you understand that?

23          THE DEFENDANT:  Yes, Your Honor.

24          THE COURT:  Now, I'm sure Mr. Daniel has been over

25  our Sentencing Guidelines with you.  I'm not speaking about

1    the Sentencing Guidelines right now, I'm talking about the

2    statutory penalty for what you're pleading guilty to.  And in

3    this Court's discretion, you could be sentenced to a maximum

4    term imprisonment of 30 years, a maximum fine of $1 million,

5    supervised release for five years, and a special assessment of

6    $100.

7         Now, by supervised release I mean after you serve any time

8    of incarceration that you might be sentenced to, that you'll

9    be under the jurisdiction of the probation officer for five

10   years.  And he would tell you what the terms and conditions of

11   your supervised release were, and as long as you lived up to

12   them, everything would be fine.  But if you violated the terms

13   and conditions of your supervised release, then he could bring

14   you back before the Court, ask the Court to revoke your

15   supervised release.  If the Court did that, you'd be sentenced

16   to a maximum of another three to five years, and you wouldn't

17   get any credit for the time you'd been on supervised release,

18   which begins when you're released from the institution.

19        You wouldn't get credit for that time.  And if what you

20   did come back for violated the law, you'd have that penalty on

21   top of the other one.

22        So supervised release will be an important factor in your

23   life.  You understand that?

24             THE DEFENDANT:  Yes, sir.

25             THE COURT:  I have no reason to think that --

1    Mr. Daniel does this all the time -- he hasn't explained the

2    guidelines and how we sentence, tell you exactly right, but

3    I'm going to run over them with you just to be sure.

4         Assuming I accept your plea here today, then the probation

5    officer will begin an investigation of your background

6    primarily, or criminal background, any criminal history that

7    you've got, your activities in this particular case, and come

8    back with a presentence report, which, among other things,

9    will trace your history from date of birth till now.  Now,

10    he'll recommend to the Court a minimum and a maximum sentence

11    to be imposed upon you.

12        Now, I don't have any idea what your guideline range is;

13    first time I've seen your case.  I don't have any idea what

14    your guideline range would be.  So I'm just going to pick

15    something out of the air so we'll have something to talk

16    about.

17        Let's say he came back -- keep in mind, I have no idea

18    what it is.  But let's say the probation officer came back and

19    said your guideline range was 18 to 24 months.  That would

20    mean that under normal conditions I'd sentence you to a

21    minimum -- under the guidelines, taking just minimum

22    consideration -- to a minimum of 18 months and a maximum of

23    24.

24        Now, under certain circumstances, if I thought the

25    guidelines overstated the seriousness of your offense, I could

go below the 24; if I thought the guidelines understated the

seriousness of your offense, I could go above the 24.  But

normally under the guidelines I found your sentence would be

somewhere between that 18 to 24 months, if that happened to be

your guideline range.

Now, when the presentence report comes back, if you and

Mr. Daniel are not satisfied with something that's in it, he

could go to the probation officer and try to work out any

difference they had.  But when they do that, they bring it to

me and I'd decide it.  And then if you weren't happy with what

I did, you could appeal my ruling to the Fourth Circuit Court

of Appeals.  Now, the Government's got the same right.  If

they're not satisfied, they try to work out the differences.

If they can't, then they bring it to me and I'll settle it.

And if they're not satisfied with what I do, they've got the

same right of appeal that you have.

Now, keep in mind several things.  First of all, I'm sure

you and Mr. Daniel have talked about your guideline range and

the other sentencing factors and what kind of sentence you

might get.  But the Court hasn't been any party to any of

that, and neither has the probation officer.  So while I have

no reason to think he hasn't told you exactly correct, that --

if the presentence report comes back with a higher guideline

recommendation than you anticipated, you couldn't tell me,

well, my attorney told me my guideline range was going to be

1  less than that and you can't go above it.  I haven't been a

2  party to any of that conversation, so I'm not bound by it.

3  I'm not saying that's going to happen, but I'm not bound by

4  that, any conversation you had with your attorney or maybe

5  your attorney has had with the United States Attorney, because

6  I haven't been a party to it.

7      Another important factor is that you need to tell

8  Mr. Daniel the truth about your whole life's history.  Because

9  if you have done something else that you didn't tell him

10  about, the probation officer will pick it up when he starts

11  reviewing your past, and whatever he finds something, that may

12  double your guideline range.  And you couldn't come back and

13  say, well, my attorney told me my guideline range is 18 to 24,

14  and here it is 50 to 75.  That wouldn't be helpful to you,

15  because if you had told him the truth, he'd have told you what

16  your guideline range is.  So it's important to be truthful

17  with your attorney.

18      Now, when we establish your guidelines, after we discuss

19  them and go over them, if you have any objection to what the

20  probation officer finds, then I look at Section 3553 of the

21  Criminal Code of laws of the United States.  And that section

22  tells me that in considering a sentence, I should establish

23  your guideline range, have it before me, and that I should

24  also consider your case as an individual case, not what

25  somebody else might have gotten for what they did, or not what

1    somebody else might get or anybody else's situation.  I look

2    at your situation, your situation alone.  You bring the bad

3    and the good with you.  If you have a good background, you

4    bring that to court with you.  If you've got a bad background,

5    it comes into court with you, too.  And I consider that

6    factor, your own individual situation.

7         Then that statute directs me to give you a punishment to

8    punish you in accordance with what you have done, keeping in

9    mind that the punishment should be one that hopefully would

10   deter others similarly situated from committing the same kind

11   of crime, and a sentence that would maintain the confidence

12   that the public has in the judicial system.

13        So I put those factors from Section 3553 and meld them in

14   with your guideline range, and that's how I arrive at a

15   sentence for you.  And that's the way the sentencing is done.

16        Now, you've entered into this plea agreement with the

17   Government to plead guilty to these charges.

18        Did anybody threaten you or force you or do anything to

19   make you plead guilty?

20             THE DEFENDANT:  No, Your Honor.

21             THE COURT:  You and the Government have agreed that

22   you're going to plead guilty, and that you entered into an

23   agreement to commit bank fraud, and that you participated in

24   that agreement, and that some act was committed to further

25   that agreement by you or one of the -- somebody else who is

1  acting along with you, conspiring with you.

2      Now, I've already told you what the statutory penalty was.

3      Now, you agree to give to the United States Attorney any

4  financial information that they want from you, and you agree

5  to make restitution in an amount to be determined at a time

6  for sentencing, and to pay this.  If you can't pay it at one

7  time, you can pay it along as best you can.

8      Now, you say in here that you realize that while I might

9  listen to your attorney and the Government, that the

10  sentencing is entirely left to the Court.  And that anything

11  that anybody else has told you is just a prediction, it's not

12  something -- because I haven't discussed the case with one

13  soul.

14      And you agree that if the probation officer comes in with

15  a higher guideline range than you expected, and convinces me

16  by the greater weight of the evidence that he's right, you

17  can -- Mr. Daniel can protest it, and even the United States

18  Attorney could disagree with it.  But you agree that if I'm

19  convinced it's correct, then I have a right to go up higher

20  than you thought you were going to get.

21      Now, of course, any obligations that the Government has,

22  any benefits in this plea agreement to you are dependent on

23  you being truthful with the Government, and carrying out all

24  the terms of this agreement.  Because if you failed to do so,

25  the Government can just back out of it, but you can't.  You

1    can't withdraw your guilty plea.

2        And speaking of that, you can't next week say, you know, I

3    wish I hadn't pled guilty, or next month, and come in and say

4    I think I'll go down there and withdraw my guilty plea.  You

5    can't do that.  Once I accept it, there's nothing left to do

6    except get the presentence report and to sentence you.  Of

7    course, you'll have ample hearing at that time.

8        Now, you agree to be truthful and tell the Government and

9    any law enforcement officer, state, federal, local, whoever it

10   might be, any information about any criminal activity, not

11   just this, not just this you were involved in, but any

12   criminal activity you know about.  You don't agree to make up

13   something on somebody just because it might help the

14   Government; all you do is agree to be truthful about any

15   criminal information you know anything about.  You agree to

16   give the Government any papers or books that you have that

17   they may want.  You agree to testify before any grand jury

18   which is investigating criminal activity, or any petty jury

19   which is prosecuting -- before whom somebody is being

20   prosecuted; you agree to testify truthfully --

21            THE DEFENDANT:  Yes, Your Honor.

22            THE COURT:  -- before both of those groups, tell them

23   anything you know.

24       Now, as long as you do, that fine.  If you don't, then, as

25   I said, the Government can back out of this, but you can't.

1        Now, its it's really important that you be truthful and

2   carry out the terms of this agreement.  Because if you don't,

3   the Government can get out of it and recommend that you be

4   sentenced to a maximum security institution, given the maximum

5   sentence, and prosecute you for any other crimes that they

6   might be able to find that you committed.

7        And one thing they could do that they normally couldn't do

8   under any circumstances; if, in being truthful with them, you

9   tell them about some other criminal activity in which you

10  participated that they knew nothing about, they can't

11  prosecute you for that, because you would be making evidence

12  against yourself.  However, if you do do that, tell them

13  something they didn't know, but at the same time tell them

14  something else that's not truthful, they can even go back and

15  prosecute you for that crime they knew nothing about until you

16  told them.  You waive any rights you have.

17       Now, the Government agrees if you cooperate with them as

18  you've agreed to do, that at sentencing or thereafter they'll

19  move the Court for what we call a downward departure, they'll

20  ask that your sentence be lowered.  But keep in mind that it

21  makes no difference how hard Mr. Daniel may argue or how hard

22  the United States Attorney may argue, that whether to grant

23  you a downward departure is left solely to my discretion, so

24  long as I realize I've got that discretion, and I do realize

25  it.  I'm not indicating this would happen, but after hearing

1   everybody, if I should say, well, I'm sorry, I just can't -- I

2   just can't -- he's a bad fellow and I can't do that, there's

3   no place to appeal my finding.  No place.  You'll just be

4   bound by it.  I'm not saying that's going to happen, but

5   that's something that could happen.

6       Now, you also realize that since you're pleading guilty to

7   an offense that involves dishonesty and fraud, that you can't

8   participate directly or indirectly in any affairs of any

9   federally-insured bank or credit union, and you can't serve as

10  a director or officer, employee, agent, stockholder of any

11  other institution that's federally insured in any way.

12      And you agree that you and Mr. -- as we said before, you

13  and Mr. Daniel have been over this whole case against you, all

14  the charges against you that you pled guilty to or are

15  pleading guilty to.  And that you're fully satisfied with his

16  services, and that this is after consulting with him and

17  giving it due consideration, that you are the one that's

18  pleading guilty to this, and you're doing it willingly and

19  voluntarily.  And you agree that what we've been over is all

20  the promises.

21      Has anybody made any other promise to you to get you to

22  plead guilty, except what we've talked about?

23              THE DEFENDANT:  No, sir.

24              THE COURT:  Now, the United States Attorney is going

25  to tell me what you did, and I want you to listen carefully.

1    Because when he gets through, I'm going to ask you,

2    Mr. Witkowski, is what he said substantially true and correct.

3    If it is, you tell me it is; if it's not, you tell me it's not

4    and why it isn't.

5         If y'all would step over that way.

6              MR. DeHART:  Judge Blatt, these facts are a little

7    bit lengthy, so if it pleases the Court, bear with me, it's

8    kind of a long charge.

9         But, Your Honor, Blair Witkowski is a former loan officer

10   at Carolina First Bank in Hilton Head.  And from 2005 to 2008,

11   he conspired with others to commit bank fraud.

12        Your Honor, there are two basic separate but related

13   phases of the case.  In phase one, Witkowski approved numerous

14   construction loans for the construction of residential houses

15   in Bluffton, in Beaufort, South Carolina.

16        The two owners of the construction company and Witkowski

17   structured some unusual loan agreements for spec houses.

18   Judge, a spec house is a house that is built without a buyer

19   in place.

20        In order to obtain financing for these homes, the

21   construction company promised investors that it would pay them

22   ten percent of the loan amount, and make the mortgage payments

23   for a year, if the investors obtained construction loans for

24   the homes.  And under this deal, when the homes were sold, the

25   construction company would reap the profits.  Your Honor, as a

1    practical matter, the construction company was paying to use

2    the individual investors' credit to finance the construction

3    of these spec homes.

4        The investors were referred to Mr. Witkowski to obtain the

5    loans, and the investors provided him their financial

6    information and a power of attorney.

7        In order for the investor to afford multiple mortgages,

8    Witkowski inflated their income and their assets on the loan

9    applications.  For example, if an investor made $200,000 per

10    year, Witkowski would state on the loan application that the

11    investor made $450,000 a year.  All the investors were

12    interviewed, and they all said they were not aware that

13    Witkowski made these false statements on their loan

14    applications.

15        Judge Blatt, unfortunately, the deals did not go as

16    planned.  The investors rarely got ten percent of the loan

17    amount, as promised.  The construction was usually overbudget

18    and behind schedule.  And some of the homes were not sold

19    within one year.

20        Your Honor, when the houses were not sold, the investors

21    realized that they were responsible for the mortgage payments,

22    because their name was on the mortgage.

23        Your Honor, at that point some investors threatened

24    litigation, and this led to the second phase of the

25    conspiracy.

1      In phase two, Witkowski realized that his false statement

2   on the mortgage applications would be exposed, if the homes

3   were not sold.  Your Honor, his father owned a real estate

4   company in New Jersey.  And Witkowski conspired with his

5   father and others in New Jersey to flip the houses in Beaufort

6   to straw buyers.  Excuse me.  In Bluffton, Your Honor.

7      Judge, inflated appraisals were key to the fraud.  For

8   example, if a home was worth $500,000, Witkowski and others

9   would arrange for a straw buyer to buy it for $750,000.  And

10  under the scheme, Your Honor, the original mortgage would be

11  paid off, and Witkowski and his co-conspirators would use the

12  extra $250,000 to pay the straw purchaser to set aside money

13  for mortgage payments for a limited period of time and then to

14  embezzle the rest of the money.

15      And in the second phase, Your Honor, the sale to the

16  buyers in New Jersey, Witkowski made even more egregious false

17  statements on these loan applications.  For example, he

18  approved a loan for a part-time teacher in New Jersey who made

19  $18,000 a year, but he stated in the loan application that she

20  made $14,000 per month.  These straw purchasers in New Jersey

21  were paid between 200,000 -- excuse me -- between 20,000 and

22  $100,000 for their role in the fraud.

23      Judge, there were less than 30 houses involved in the

24  conspiracy, but the loss to the bank is approximately

25  $5 million.  The parties have stipulated under the Sentencing

1   Guidelines that the loss amount is more than $2.5 million, but

2   less than $7 million, for purposes of the guidelines.

3       Your Honor, the homes were built at the height of the real

4   estate market in 2005 to 2008, and they were sold at inflated

5   prices.  And after the straw buyers abandoned the mortgages,

6   the homes were sold in foreclosure in a depressed market for

7   large losses.

8       Witkowski received approximately $500,000 in kickbacks, in

9   addition to his salary and commission for his role in the

10  fraudulent loan.

11      To his credit, he has cooperated extensively with the U.S.

12  attorney's office in South Carolina and New Jersey, and the

13  U.S. attorney's office in New Jersey is prosecuting at least

14  five of Witkowski's co-conspirators there, based on his

15  cooperation, including his father.

16          THE COURT:  Anybody being prosecuted down here?

17          MR. DeHART:  Your Honor, the investigation is ongoing

18  here, and it is near completion in New Jersey.

19          THE COURT:  All right, sir.  Mr. Witkowski, you heard

20  what the United States Attorney told me.  Is what he told me

21  substantially true and correct?

22          MR. DANIEL:  Your Honor, as to phase one with all the

23  illegalities that occurred, it is most certainly substantially

24  correct.

25      As to phase two --

1          THE COURT:  Wait a minute.  Let's go back now.

2    What's wrong with phase one?

3          MR. DANIEL:  No, we agree fully with everything that

4    Mr. DeHart described in phase one.

5          THE COURT:  Is that correct, Mr. Witkowski?

6          THE DEFENDANT:  Yes, Your Honor.

7          THE COURT:  All right, go ahead.

8          MR. DANIEL:  Your Honor, there are many facts in what

9    he described as phase two, that we do not agree with, we take

10   issue with.  We understand it was certainly an illegality, Mr.

11   Witkowski does, but he takes issue with many of the facts that

12   were stated in phase two.

13         THE COURT:  Is there any of the facts that go to his

14   guilt or innocence?

15         MR. DANIEL:  Well, not overall, Your Honor, because

16   phase one is all crimes in itself, and that's what he's

17   charged with.  But most of it in phase two is probably

18   correct, but just some of the facts.  But I would say overall

19   it would still give rise to criminal conduct in phase two as

20   well.

21         THE COURT:  Do you agree with that, Mr. Witkowski?

22         THE DEFENDANT:  Yes, Your Honor.

23         THE COURT:  All right.  Based on that, Mr. Daniel, do

24   you know of any reason I shouldn't accept his plea of guilty

25   to this charge?

1      MR. DANIEL:  No, Your Honor.

2      THE COURT:  Do you know of any, Mr. United States

3  Attorney?

4      MR. DeHART:  No, Your Honor, I would note for the

5  record, Judge, there's also a forfeiture allegation at the end

6  of the information, that I don't believe that Mr. Witkowski --

7      THE COURT:  No, I didn't.

8      MR. DeHART:  Yes, sir, just for the record, it was

9  filed thereto --

10      THE COURT:  Just a minute.  Mr. Witkowski, you also

11  agree that all of this property, any property that you have

12  got that came directly or indirectly or in any way connected,

13  just part of it was connected in any way to these transactions

14  that the Government has listed, you agree to forfeit all of

15  this property or any proceeds that the Government can put

16  their hands on, and up to $6,000,764.52.  And you agree that

17  if the Government can't find that much money, that any other

18  property that you have up to that amount, that you forfeit it

19  all to the Government.  In other words, all your property that

20  is gotten through any of this, any of these transactions or

21  any other property, you agree to forfeit to the Government to

22  be applied on this debt.  You understand that?

23      THE DEFENDANT:  Yes, Your Honor.

24      THE COURT:  Is that correct, Mr. United States

25  Attorney?

1          MR. DeHART:  That's correct, sir.

2          THE COURT:  Mr. Daniel?

3          MR. DANIEL:  Yes, sir.

4          THE COURT:  All right, sir.  Now, I see he's on bond.

5          MR. DANIEL:  He hasn't been yet, Your Honor, but I

6     think they're considering an unsecured bond, Your Honor, with

7     the courts.

8          THE COURT:  That's right, because he hasn't been

9     arraigned.  Well, I'm going to send you -- let you find out --

10    Mr. Probation officer, find out if there's a magistrate here.

11         PROBATION OFFICER:  Your Honor, Magistrate Judge

12    Marchant is available this afternoon.

13         THE COURT:  I'm going to let you go to the

14    magistrate, who will set bond.  And he's -- When is this

15    information dated?

16         MR. DeHART:  Judge Blatt?

17         THE COURT:  How long has he been out since he was --

18         MR. DeHART:  Judge Blatt, if it pleases the Court,

19    Your Honor --

20         THE COURT:  I can't hear you.

21         MR. DeHART:  Your Honor, if it pleases the Court,

22    forgive me, Judge, this is Mr. Witkowski's first court

23    hearing, because he waived indictment.

24         THE COURT:  Yes, sir, I understand that.  I said

25    somebody has got to set a bond for him.

1          MR. DeHART:  Yes, sir.  What I was going to add, if

2     it please the Court, we'll do what Your Honor wants.  But he

3     has no prior record; we're going to recommend a PR bond.

4          THE COURT:  I agree, that I think I was going to tell

5     Mr. Daniel to go find a magistrate and tell the magistrate I

6     said he ought to be given a bond, and let him set his bond.  I

7     just like the magistrate to set the bond.

8          MR. DeHART:  Okay.

9          THE COURT:  You say that -- if there's one here now,

10    you say there's one here.  So then you just go and find one

11    here so you don't have to spend the night in jail.

12         MR. DANIEL:  All right.

13         THE COURT:  Mr. Witkowski, when the presentence

14    report's prepared and you and Mr. Daniel have been over it and

15    you've had an opportunity to earn your downward departure,

16    then we'll get you back for sentencing.

17        All right.  Good luck to you.

18

19        (Court adjourned at 4:19 p.m.)

20

21

22

23

24

25

1                    REPORTER'S CERTIFICATION

2

3          I, Debra L. Potocki, RMR, RDR, CRR, Official Court

4    Reporter for the United States District Court for the District

5    of South Carolina, hereby certify that the foregoing is a true

6    and correct transcript of the stenographically recorded above

7    proceedings.

8

9

10

     S/Debra L. Potocki
11   _____

12   Debra L. Potocki, RMR, RDR, CRR

13

14

15

16

17

18

19

20

21

22

23

24

25